**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA**

**vs.**                                   **CRIMINAL ACTION No.: 3:03-CR-30-HTW-JCS**

**ROOSEVELT WALKER**

<u>**ORDER**</u>

BEFORE THIS COURT is the defendant's Motion for Compassionate Release Due to COVID-19. **[Docket no. 388]**. Defendant, by his motion, asks this court to reduce his sentence or to order the United States Bureau of Prisons to allow him to serve the remainder of his sentence on home detention. The United States of America opposes such motion, saying that defendant has failed to meet his burden of proof and that this court does not have the jurisdiction to order home detention. This court has reviewed the submissions of the parties and finds that defendant's Motion for Compassionate Release Due to COVID-19 **[Docket no. 388]** must be denied for the reasons set forth below.

**I. FACTUAL BASIS**

On October 7, 2003, defendant Roosevelt Walker (hereinafter referred to as "Walker") was indicted for conspiracy to commit murder with the intent to prevent the appearance of a witness at a criminal trial in violation of Title 18 U.S.C. §§ 1512(a)(1)(A) and (a)(3). Thereafter, Walker elected to proceed by jury and was found guilty by a federal petit jury on February 4, 2006. On April 13, 2006, this court sentenced him to the custody of the United States Bureau of Prisons (hereinafter referred to as "BOP") to be imprisoned for a term of life imprisonment.

Walker is currently serving his federal sentence at Memphis Federal Correctional Institution located in Memphis, Tennessee (hereinafter referred to as "FCI Memphis"). As of

1

September 9, 2020, BOP reports that FCI Memphis has 12 confirmed COVID-19 cases out of a total population of 1,102.

Walker, now a fifty-two (52) year old African-American male, filed his request for compassionate release with the Warden of FCI Memphis on June 19, 2020. The government does not contest Walker's assertion. After no response from the Warden, Walker filed his motion with this court on August 4, 2020.

<u>BOP and the COVID-19 Pandemic</u>

COVID-19, an extremely contagious illness, has caused many deaths in the United States in a short period of time and has resulted in massive disruption to the American society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (3/19/2020). BOP has had a Pandemic Influenza Plan in place since 2012. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January, 2020. At that time, BOP established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control. BOP also reviewed guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan (hereinafter referred to as "Action Plan"), to minimize the

risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least fourteen (14) days, in order to stop any spread of the disease. Only limited group gatherings are afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP further has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step, as well, will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of fourteen (14) days, or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19, or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, Pennsylvania, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g., medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended, absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

BOP stopped social and legal visits on March 13, 2020, and those visits remain suspended, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance from 300 to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2)[1], and to

---

[1] (c) Prerelease custody.—[…]

  (2) Home confinement authority.--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months. The Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph.

18 U.S.C.A. § 3624 (West)

move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g)[2].

---

[2] (g) Elderly and family reunification for certain nonviolent offenders pilot program

    (1) Program authorized

        (A) In general

            The Attorney General shall conduct a pilot program to determine the effectiveness of removing eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities and placing such offenders on home detention until the expiration of the prison term to which the offender was sentenced.

        (B) Placement in home detention

            In carrying out a pilot program as described in subparagraph (A), the Attorney General may release some or all eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities to home detention, upon written request from either the Bureau of Prisons or an eligible elderly offender or eligible terminally ill offender.

        (C) Waiver

            The Attorney General is authorized to waive the requirements of section 3624 of Title 18 as necessary to provide for the release of some or all eligible elderly offenders and eligible terminally ill offenders from Bureau of Prisons facilities to home detention for the purposes of the pilot program under this subsection.

    (2) Violation of terms of home detention

        A violation by an eligible elderly offender or eligible terminally ill offender of the terms of home detention (including the commission of another Federal, State, or local crime) shall result in the removal of that offender from home detention and the return of that offender to the designated Bureau of Prisons institution in which that offender was imprisoned immediately before placement on home detention under paragraph (1), or to another appropriate Bureau of Prisons institution, as determined by the Bureau of Prisons.

    (3) Scope of pilot program

        A pilot program under paragraph (1) shall be conducted through Bureau of Prisons facilities designated by the Attorney General as appropriate for the pilot program and shall be carried out during fiscal years 2019 through 2023.

    (4) Implementation and evaluation

        The Attorney General shall monitor and evaluate each eligible elderly offender or eligible terminally ill offender placed on home detention under this section, and shall report to Congress concerning the experience with the program at the end of the period described in paragraph (3). The Administrative Office of the United States Courts and the United States probation offices shall provide such assistance and carry out such functions as the Attorney General may request in monitoring, supervising, providing services to, and evaluating eligible elderly offenders and eligible terminally ill offenders released to home detention under this section.

    (5) Definitions

        In this section:

            (A) Eligible elderly offender

The term "eligible elderly offender" means an offender in the custody of the Bureau of Prisons--

(i) who is not less than 60 years of age;

(ii) who is serving a term of imprisonment that is not life imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16 of Title 18, sex offense (as defined in section 20911(5) of this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18, and has served 2/3 of the term of imprisonment to which the offender was sentenced;

(iii) who has not been convicted in the past of any Federal or State crime of violence, sex offense, or other offense described in clause (ii);

(iv) who has not been determined by the Bureau of Prisons, on the basis of information the Bureau uses to make custody classifications, and in the sole discretion of the Bureau, to have a history of violence, or of engaging in conduct constituting a sex offense or other offense described in clause (ii);

(v) who has not escaped, or attempted to escape, from a Bureau of Prisons institution;

(vi) with respect to whom the Bureau of Prisons has determined that release to home detention under this section will result in a substantial net reduction of costs to the Federal Government; and

(vii) who has been determined by the Bureau of Prisons to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention.

(B) Home detention

The term "home detention" has the same meaning given the term in the Federal Sentencing Guidelines as of April 9, 2008, and includes detention in a nursing home or other residential long-term care facility.

(C) Term of imprisonment

The term "term of imprisonment" includes multiple terms of imprisonment ordered to run consecutively or concurrently, which shall be treated as a single, aggregate term of imprisonment for purposes of this section.

(D) Eligible terminally ill offender

The term "eligible terminally ill offender" means an offender in the custody of the Bureau of Prisons who--

(i) is serving a term of imprisonment based on conviction for an offense or offenses that do not include any crime of violence (as defined in section 16(a) of Title 18, sex offense (as defined in section 20911(5) of this title), offense described in section 2332b(g)(5)(B) of Title 18, or offense under chapter 37 of Title 18;

(ii) satisfies the criteria specified in clauses (iii) through (vii) of subparagraph (A); and

(iii) has been determined by a medical doctor approved by the Bureau of Prisons to be--

6

Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of August 7, 2020, BOP has transferred 7,378 inmates to home confinement.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

## II. ANALYSIS

Defendant filed his motion, citing Title 18 U.S.C. § 3582(c)(1)(A) for authority. Section 3582, commonly referred to as the First Step Act, provides:

(c) Modification of an imposed term of imprisonment.--The court may not modify a term of imprisonment once it has been imposed except that--

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse

---

(I) in need of care at a nursing home, intermediate care facility, or assisted living facility, as those terms are defined in section 1715w of Title 12; or

(II) diagnosed with a terminal illness.

34 U.S.C.A. § 60541 (West)

of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

> (i) extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

>> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and

> (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; […]

18 U.S.C.A. § 3582 (West).

### a. Exhaustion of Administrative Remedy

The parties are in agreement that Walker has exhausted his administrative remedies and this matter is now properly before this court.

### b. Burden of Proof

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

To establish that defendant should be afforded compassionate release, the defendant must show "extraordinary and compelling circumstances exist". The United States Congress further defined its intent in Title 28 U.S.C. § 994(t) which provides:

> The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.

For further guidance, the Sentencing Guidelines policy statement at § 1B1.13 provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

The Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
>> (A) Medical Condition of the Defendant.—
>>
>>> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>>
>>> (ii) The defendant is—
>>>
>>>> (I) suffering from a serious physical or medical condition,
>>>>
>>>> (II) suffering from a serious functional or cognitive impairment, or
>>>>
>>>> (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes

9

the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

Walker argues that the categories of health conditions listed in the Sentencing Commission's policy statement "do not capture all extraordinary and compelling circumstances," and that the policy statement "indicate[s] that medical conditions, alone or in conjunction with other factors, can constitute extraordinary and compelling reasons" for compassionate release. *United States v. Beck*, No. 13-cr-186-6-CCE, 2019 WL 2716506, *8 (M.D.N.C. June 28, 2019). Walker further argues that it is "not required to find that all of the criteria in [Comment] Note 1 are met in order to grant" compassionate release on the basis of a medical condition. *United States v. Dimasi* 220 F. Supp. 3d 173, 193 (D. Mass. 2016).

Walker lists the following medical conditions as placing him at risk for contracting COVID-19: pulmonary hypertension (high blood pressure); diabetes; cellulites; hyperlipidemia (high cholesterol); and asthma. The government provided copies of Walker's medical records from BOP and they show that he is under constant and continuous care to manage his medical conditions. This court does not find that Walker has presented evidence that he suffers a terminal

illness with an end of life trajectory. Similarly, this court does not find that Walker's ability to provide self-care while in the custody of BOP is diminished and that he is not expected to recover.

Walker also says that "the coronavirus has created a[n] 'extraordinary and compelling reason' that warrants a reduction of his sentence." This court is not persuaded. As United States District Court Judge Keith Starett recently said:

> "Preexisting medical conditions that place a defendant at increased risk for serious illness from COVID-19 are not in and of themselves sufficient to establish" grounds for compassionate release. *United States v. McLin*, 2020 WL 3803919, at *3 (S.D. Miss. July 7, 2020). Likewise, "general concerns about possible exposure to COVID-19" are not sufficient. *United States v. Takewell*, 2020 WL 404360 at *4 (W.D. Louisiana July 17, 2020). "[T]he mere existence of COVID-19 in society" and, consequently, the prison system "cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020) (citing BOP's COVID-19 Action Plan).

*United States v. Williams*, No. 2:16-CR-10-KS-MTP, 2020 WL 4210476, at *3 (S.D. Miss. July 22, 2020).

This court is required to follow 5th Circuit precedent. *See Guillot v. Unum Provident Corp*, No. 05-0858, 2006 U.S. Dist. LEXIS 94734, at *12 (W.D. La. Nov. 21, 2006). A generalized fear of contracting COVID-19 does not justify compassionate release. *United States v. Brown*, No. 3:18-cr-29-DCB-LRA, 2020 U.S. Dist. LEXIS 109625, at *5 (S.D. Miss. June 23, 2020) (Citing *United States v. Williams*, No. 3:19-00239-01, 2020 U.S. Dist. LEXIS 99374, 2020 WL 3037075, at * (W.D. La. Jun. 5, 2020); *United States v. Veras*, No. 3:19-cr-010, 2020 U.S. Dist. LEXIS 59748, 2020 WL 1675975, at * 6 (M.D. Pa. Apr. 6, 2020); *United States v. Clark*, No. CR 17-85-SDD-RLB, 2020 U.S. Dist. LEXIS 59439, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020)).

As of July 24, 2020, the BOP held 129,430 inmates. BOP already had instituted its own program to address COVID-19 concerns and its effects on the inmate population. For this court to find that COVID presents such an overwhelming circumstance, standing on its own, would defy

11

logic and potentially allow all the inmates currently held in BOP facilities to be returned to the free world. Accordingly, this court does not find that the mere existence of the COVID-19 pandemic, without finding the remaining factors listed in the statute, mandates or allows a compassionate release.

       *c. Caretaker Provision*

Walker argues that courts have recognized that caring for a parent when there's no one else to fill that role constitutes an "extraordinary and compelling" reason to grant compassionate release. *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019)(When a defendant is the "only available caregiver" for an incapacitated parent – perhaps a more unique occurrence given that inmates may have siblings or other family members able to care for their parents – then, it is likewise an "extraordinary and compelling" reason warranting compassionate release.); *United States v. Riley*, No. 2:12-cr-62, 2020 U.S. Dist. LEXIS 82909 (D. Vt. May 12, 2020)(compassionate release granted based on age, asthma, and defendant's father's failing health and his being the only person available to provide his father's daily care.); *United States v. Hernandez*, Case No. 16-20091 (S.D. Fl. April 3, 2020)(extraordinary and compelling reasons warranting a compassionate release reduction where defendant was the only possible caregiver for his 84- year-old mother suffering from degenerative ocular disease and cancer (in remission) that renders her functionally blind and has mobility issues); *see also United States v. Lisi*, 2020 U.S.Dist. LEXIS 31127 (S.D.N.Y. Feb. 24, 2020)(court found that if the defendant's claims are factually accurate, and he is the only person capable of caring for his mother, then that would constitute an extraordinary and compelling reason for compassionate release.).

Walker says that his sister is the primary caretaker for his parents. He argues that if this court were to grant compassionate release, he would take over the primary caretaker role for his parents and relieve his sister of the duty.

The government properly responds that Walker, resultantly, is not the only living child who can take care of his elderly parents. *See United States v. Sonnier*, 2020 WL 4601638 at *4 (E.D. Louisiana August 11, 2020) (inmate not the only available caregiver for elderly parent). This court accordingly finds that Walker is not due consideration under the care taker provision.

###### d. *Danger to the Community*

Even if this court were to find that Walker had presented extraordinary and compelling reasons to grant compassionate release, he still has not demonstrated that he "is not a danger to the safety of any other person or to the community, as provided in Title 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2)[3]. Title 18 U.S.C. § 3142(g)[4] requires this court to consider factors such as the nature

---

[3] Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that--

> (1)(A) Extraordinary and compelling reasons warrant the reduction; or

>> (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

> (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

> (3) The reduction is consistent with this policy statement.

U.S.S.G. 1B1.13

[4] (g) Factors to be considered.--The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning--

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

> (2) the weight of the evidence against the person;

> (3) the history and characteristics of the person, including--

and circumstances of the charged offense, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community at large that would be posed by the defendant's release. The safety of the community has been found to refer "not only to the mere danger of physical violence but also to the danger that the defendant might engage in [any] criminal activity to the community's detriment." *United States v. Mackie*, 876 F. Supp. 1489, 1491 (E.D. La. 1994).

Walker's offense of conviction, conspiracy to kill a government witness violated Title 18 U.S.C. §§ 1512(a)(1)(A) and 1512(k)[5]. The facts of his criminal conduct were especially gruesome.

To fully understand the depravity of Walker's criminal conduct, one must study the facts presented in *United States v. Levon Edmond,* et al, 3:03-CR-30-HTW-LRA and *United States v. Joe Lewis Collins* 3:06-cr-24-HTW-JCS. The defendants in the former case were: Levin Edmond

---

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C.A. § 3142 (West)

[5] (a)(1) Whoever kills or attempts to kill another person, with intent to--

(A) prevent the attendance or testimony of any person in an official proceeding; […]

shall be punished as provided in paragraph (3). […]

(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C.A. § 1512 (West)

(hereinafter referred to as "Edmond"); Kathleen Nelson (hereinafter referred to as "Nelson"); and Walker. Edmond and Nelson are sisters. Of the two (2) cases, *United States v. Edmond* et al went first to trial.

When the prosecution first undertook to investigate the criminal activities of the trio, the prosecution focused upon just a theft scenario involving money from the Pigford Glickman Black Farmers' Fund (hereinafter referred to as "the Fund"). The Fund, initiated by Congress, was created to compensate African-American farmers who had been the victims of race discrimination when these African-American (black farmers) had been denied government loans by the United States Department of Agriculture (hereinafter referred to as "USDA"). To receive compensation under the Fund, a claimant had to submit a claim, specifying the amount of money denied and a statement under oath that the claimant was a farmer. Once the government approved the claim, the government would send the claimant a check for the approved sum.

Although the Fund sought to protect the government's money from fraud by requiring claims under oath, involvement of a bar-licensed attorney, and bureaucrats in the distributing centers (here, Atlanta, Georgia) charged with investigating claims, the Fund was easy picking for determined crooks. Moreover, in the instant scenario, thievery morphed into a murder, probably two, and the placement of the child of one of the victims with the family of the murderers.

We begin with the claimant, Clovis Reed (hereinafter referred to as "Reed"). Claiming in her papers that she was a farmer who had been wrongfully denied a loan, for which she was qualified, from the USDA, she submitted her claim. In due time, her claim was approved for the maximum allowed compensation sum of $50,000. She was to receive her money by check sent out through the mail. When she did not receive her money through the mail, she made repeated calls

to the Atlanta processing center. She was told that the check had been sent to her in Canton, Mississippi, and subsequently cashed. Reed requested an investigation.

The government tracked the check to a Mississippi bank and, ultimately, discovered that the check had been intercepted by Edmond and Nelson. Upon depositing the $50,000 check, the sister pair had forged Reed's name, and opened an account in the name of Edmond, Nelson, and Reed. The sisters thereafter quickly travelled to another branch of the bank and withdrew the money… for themselves. Reed pressed criminal charges.

Later, the sisters were indicted. They elected to plead guilty and so notified the court of that intention. The government had bank film of them opening the bogus account and undisputed proof of their forging Reed's signature on the bank forms.

On the day set for their pleas before this court, the sisters repudiated their earlier announcement that they would plead guilty. They then claimed that they had not stolen the money at all, that while they had claimed the money as theirs, they did so because Reed actually owed them a sum of money and Reed was aware they would look to the $50,000 for a payment.

The court and prosecution were shocked at this development. The court wanted to hear from Reed who previously had attended all court functions involving this matter. After a frantic search for her, the prosecution announced it could not locate her. Further, the prosecution suspected foul play.

The Federal Bureau of Investigation (hereinafter referred to as "FBI") soon thereafter found Reed's car in Jackson, Mississippi, approximately twenty-two (22) miles from her home and workplace in Canton, Mississippi. The car's door window had been busted and unmistakable blood stains were observed in the interior of the car. Reed herself was not located. Clearly though, whatever had happened to Reed had first occurred in Canton, Mississippi, since busted glass from

16

her car was found in Canton, on the route she would normally take to travel home at night from her job.

A few days later, approximately one hundred (100) miles south of Jackson, Mississippi, a bee-keeper, taking a short-cut to his hives, over property adjacent to his, came upon the remains of a strange dead creature lying on the ground in an area a short distance from the nearest well-travelled road. To reach this site, one would have to leave the well-travelled, paved road, drive a short distance down an unpaved road, then take a left turn onto a seldom used unpaved road. Anyone searching for this site would not be able to spot it from the main paved road.

The bee-keeper cautiously investigated, then determined to his horror that the "strange creature" was that of a mutilated corpse – the head and both hands of which had been sawed off. The corpse, by DNA, was found to be that of Reed. Someone had dragged the corpse onto the property from the highway, started digging a grave, but had left the corpse above ground.

The authorities now added murder to their investigation. They secured search warrants for the sisters' cellphones and made the most of cellphone-tower tracking. Eventually, the FBI ascertained what had happened: Reed had been way-laid in Canton, killed there, that her car had been driven to Jackson, Mississippi, left at a troubled apartment complex, while Reed's body had been transported to south Mississippi for secret burial.

This murder investigation also added Walker's name. Walker and one of the sisters, Nelson, had been dating for an extended period of time. His cell phone placed him in south Mississippi during the attempted burial.

The prosecution wanted to seek capital murder indictments against the three defendants, for theft, for fraud, murdering a witness and, associated therewith, for capital murder.

Before, a local United States Attorney may pursue capital murder against a defendant, the local United States Attorney must submit a request to the Capital Case Committee of the United States Attorney General to do so.[6] The targeted defendant has a right to a hearing and attorney representation. The proceedings, involving only the defense and the government, are secret. That hearing body does not have to explain its decision to the public, nor even to the local United States District Court Judge handling the case.

On December 17, 2004, to the shock of those following this procedure, the attorneys for the parties announced that the Capital Case Committee of the United States Attorney General had denied the local United States Attorney's request to be allowed to seek the death penalty. The trio then went to trial before a local jury in the Southern District of Mississippi; the maximum sentence the court could impose was life imprisonment.

During the course of the trial, defendant Edmond broke rank with her co-defendants and testified against them. Her version of what really happened with the theft and murder was a huge surprise.

She testified as follows. The City of Canton had been awash with fraud involving the Fund. Numerous Canton recipients had been recruited into the massive fraud and had received bogus checks. The massive fraud in Canton, Mississippi, had been engineered by the sisters, Walker and a Joe Collins (hereinafter referred to as "Collins"), aided by their mastermind, Ebony Scott (hereinafter referred to as "Scott"). Scott, a prior high school student of Nelson's, was living in Atlanta when Nelson visited there. When the pair connected, Scott educated Nelson how they could construct a criminal ring in Canton to bilk the Fund. Thereafter, Scott relocated to Canton, where she, Nelson, Edmond, Walker, and Collins recruited other "application" members for their

---

[6] United States Department of Justice, *Justice Manual*, Title 9-10.000 Capital Crimes

gang. Once the scheme took off, monies flowed into Canton. The principals took a cut of the money and allowed the "applicants" and "attorney" their share. Scott had connections and could navigate the applications smoothly through the system.

Reed was not an innocent "applicant"; she had been a part of the gang. At one time, she and Collins had been a romantic item. Pursuant to plan, she applied to the Fund and was slated to receive $50,000. Even though she knew it would be very dangerous to do so, she balked at sharing this money with the others.

When she made this fateful decision, she knew the murderous disposition of Nelson, Edmond, and Walker. Indeed, when the trio had determined Scott supposedly was holding out on them, the trio decided to kill Scott. Thereafter, Scott completely disappeared, leaving behind her four-year (4) old baby girl. Shunterria Edmond Wiggins (hereinafter referred to as "Wiggins"), the daughter of Edmond, took in the child and even enrolled the child into school. Inexplicably, Mississippi's Heath and Human Services, even though that agency later learned all of the facts of this matter, refused to remove Ebony Scott's child from the household. That same daughter, Wiggins, had tried to help the sisters' escape the capital murder conviction by furnishing them a fake alibi. Resultantly, she herself, was charged with accessory after the fact, but pled guilty to false declarations before a grand jury. United States District Court Judge William H. Barbour sentenced Wiggins to 10 months imprisonment.

Scott's bones later were found in Simpson County, Mississippi, in the same area where Reed's mutilated body had been found. According to Edmond, they had killed Scott because "she was a crook"; Edmond had similar sentiments about Reed.

This court sentenced the trio as follows: Edmond, for testifying against the co-defendants to 25 years; Nelson, to life imprisonment; and Walker, to life imprisonment.

Later, the government, now aware of Collins' involvement, caused his indictment and put him on trial. The jury wasted no time in convicting him. This court sentenced him to two (2) terms of life imprisonment to run concurrently with each other.

Walker makes much ado about his lack of prior criminal history. This court is not persuaded that Walker's lack of criminal history is enough for this court to consider him safe for release into free society. While true that Walker had not committed any other criminal acts for which he was arrested or convicted, he willingly chose to enter a conspiracy to murder and dismember Reed. Walker committed a heinous act of violence, a fact which cannot be ignored.

According to Walker, the fact that this court imposed a life sentence on Walker does not prohibit this court from reducing Walker's sentence. For support, Walker cites the following: *United States v. Rice*, Case No. 1:03-cr-441 (D.D.C. July 8, 2020) (reducing life sentence to approximately 16.5 years); *United States v. Parker*, Case No. 2:98-cr-00749-CAS-1, 2020 WL 2572525, at *14 (C.D. Cal. May 21, 2020) (reducing life sentence to approximately 22 years, time served for 65-year-old defendant experiencing deteriorating health and particularly susceptible to COVID-19 due to several conditions resulting from the aging process); *United States v. Barrenechea*, Case No. 92-cr00403-MMC-3, 2020 WL 2315638, at *1 (N.D. Cal. May 7, 2020) (granting compassionate release and reducing life sentence to 332 months, time served for defendant with increased risk of illness from COVID-19); *United States v. Williams*, No. 3:04-cr-00095-MCR-CJK, ECF No. 91 (N.D. Fla. Apr. 1, 2020) (granting compassionate release of defendant who served 15 years of life sentence to aging prisoner with medical issues making him vulnerable to COVID-19); *United States v. Smith*, 2020 WL 2844222 (N.D. Iowa June 1, 2020) (reducing life sentence based on lung cancer and other medical conditions).

At the time of his sentencing hearing, this court considered the advisory guideline computations and the sentencing factors under Title 18 U.S.C. § 3553(a)(1) – (7)[7]. Walker has not provided anything that this court would consider mitigation of the following facts: that Walker conspired with others to kill Reed because Reed planned to testify against Walker's lover;; that Walker assisted in the dismemberment of Reed's body; that Walker boasted about his being the

---

[7] (a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.1

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C.A. § 3553 (West)

chief actor in the dismemberment because he was physically stronger than Collins; and that Walker helped to dispose of mutilated Reed's body. "'[R]ehabilitation is not, by itself, an extraordinary and compelling reason for release' from a Life sentence". *United States v. Williams*, 2020 WL 3917030 at *2 (D. Nev. July 10, 2020)

The Section 3553 factors weigh against Walker's release. *See, e.g., United States v. Lopez*, 2020 WL 4450941 (E.D.N.Y. Aug. 3, 2020) (where inmate was "not the gunman in any [murder], instead playing a support or accessorial role, the Court found his participation to have been knowing, deliberate and real." Therefore, "this alone justifies the denial of" compassionate release); *United States v. Dorsey*, 2020 WL 4432248 (D.D.C. July 31, 2020) (even though court found increased risks from COVID-19 due to medical conditions, seriousness of the offense precluded release); *United States v. Samak*, 2020 WL 4050365 at *5 (E.D. La. July 20, 2020) (inmate serving life sentence, under age 65 and not suffering terminal illness, denied release because "a reduction of his sentence would not reflect the seriousness of his offenses, promote respect for the law, provide just punishment for his offense, or afford adequate deterrence to criminal conduct"); *United States v. Garner*, 2020 WL 3632482 at *5 (S.D. Tex. July 3, 2020) (a partial quadriplegic inmate with medical conditions described as extraordinary and compelling, nonetheless denied release because, said the court, "reducing his 430 - month sentence to time served would not promote respect for the law, provide just punishment, [and] afford adequate deterrence under section 3553(a)"); *United States v. Levine*, 2020 WL 2537786 at *3 (N.D. Ind. May 19, 2020) ("society would benefit from defendant continuing to serve his life sentence, as defendant will not be able to engage in further horrific acts or otherwise cause additional torment to [survivors of murder victim]. Requiring defendant *sub judice* to complete his sentence also has deterrent value, both for defendant as well as others. Finally, requiring defendant to complete his

life sentence would promote respect for the law and provide just punishment for defendant's offense."); *United States v. Webster*, 2020 WL 618828 at *7 (E.D. Va. Feb. 10, 2020) ("the Court finds defendant's offense [murder] gravely serious, weighing against reducing his [Life] sentence.").

To this court's mind, Walker has demonstrated that he is a danger to the community because: (1) the nature and circumstances of his current offense of conviction; and (2) the weight of the evidence—his conviction at trial. *See* 18 U.S.C. § 3142(g).

This trial court would point out some other concerns about Walker's possible conduct. According to Edmond, Walker was a member of the gang defrauding the United States; and that he and the others conspired to kill Ebony Scott, whose bones were discovered where Edmond said the bones would be.

Walker's current sentence of life reflects Walker's public safety risk. Accordingly, this court finds that, even if Walker has presented an "'extraordinary and compelling reason' that, in anyone's reading of his petition, would warrant a reduction of his sentence," (which this court takes strong exception), Walker's murderous disposition unmistakably proclaims he would pose a clear danger to the community if he were released.

> *e. Home Detention*

Walker, alternatively, requests that this court order BOP to place Walker on home confinement to serve the remainder of his sentence. Once a sentence is imposed, BOP is clearly solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b)[8];

---

[8] (b) Place of imprisonment. The Bureau of Prisons shall designate the place of the prisoner's imprisonment, and shall, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons, place the prisoner in a facility as close as practicable to the prisoner's primary residence, and to the extent practicable, in a facility within 500 driving miles of that residence. The Bureau shall, subject to consideration of the factors described in the preceding sentence and the prisoner's preference for staying at his or her current facility or being transferred, transfer prisoners to facilities that

*Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *See United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). This court agrees.

### III. CONCLUSION

IT IS, THEREFORE, ORDERED that defendant's Motion for Compassionate Release Due to COVID-19 [Docket no. 388] is hereby DENIED for the reasons stated above.

SO ORDERED this the 5th day of October, 2020.

s/ HENRY T. WINGATE
**UNITED STATES DISTRICT COURT JUDGE**

---

are closer to the prisoner's primary residence even if the prisoner is already in a facility within 500 driving miles of that residence. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering—

(1) the resources of the facility contemplated;

(2) the nature and circumstances of the offense;

(3) the history and characteristics of the prisoner;

(4) any statement by the court that imposed the sentence—

(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

(B) recommending a type of penal or correctional facility as appropriate; and

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person. Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court.

18 USCS § 3621